**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DANIEL BYRD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | |
| **OUTOKUMPU STAINLESS,** | ) | |
| **USA, LLC,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |

## COMPLAINT

## INTRODUCTION

1.     This is an action alleging disability discrimination in violation of Title I of the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. 12101 et. seq., brought by Daniel Byrd.  Plaintiff Byrd is a qualified individual with a disability, has a history of disability, and/or is regarded as disabled.  Plaintiff alleges that Defendant Outokumpu Stainless USA, LLC, discriminated against him based on his disability, his record of disability, and Defendant's perception of Plaintiff as disabled, in violation of the ADA, by failing to hire him, failing to provide reasonable accommodation, and by unlawfully disclosing his medical information.  Plaintiff seeks injunctive relief, equitable relief, reinstatement, lost wages and benefits, compensatory damages, and reasonable attorney fees and costs.

## II.   <u>JURISDICTION</u>

2.     This Court has jurisdiction in accordance with 28 U.S.C. § 1331.  Venue is proper pursuant to 28 U.S.C. § 1391.

3.     Plaintiff has fulfilled all conditions precedent to the institution of this action under Title I of the ADA.  Plaintiff timely filed his charge of discrimination within 180 days of the occurrence of the last discriminatory act.  Plaintiff also timely filed his Complaint within ninety (90) days of the receipt of a Notice of Right to Sue issued by the EEOC.  See Exhibit A.

## III.   <u>PARTIES</u>

4.     Plaintiff, Daniel Byrd, is an individual over the age of 19 years and a resident of Mobile County, Alabama.  Plaintiff is an individual with a disability, has a history of a disability, and is regarded by Defendant as disabled.  Despite this disability, with or without reasonable accommodation, Plaintiff could perform the essential functions of the position of caster.  Consequently, Plaintiff is a qualified individual, as defined under the ADA.

5.     Defendant Outokumpu Stainless USA, LLC, is an "employer" as defined under the ADA and subject to compliance with the ADA.  42 U.S.C. 12111(5).  Defendant has a steel mill in Calvert, Washington County, Alabama.

## IV.   <u>FACTUAL ALLEGATIONS</u>

6.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 5 above with the same force and effect as if fully set out in specific detail herein below.

7.     Defendant has intentionally and with malice or reckless indifference, discriminated against Plaintiff on the basis of Plaintiff's disability, history of disability, and/or perceived disability, with respect to the terms, conditions and privileges of employment.

8.     In or around 2015, Daniel Byrd began working for RHI as a Refractory Tundish Installer.

9.     RHI had a contract with Defendant Outokumpu Stainless USA under which it provided workers for Defendant's steel mill in Calvert, Alabama.

10.    In his job with RHI, Byrd worked in the Caster Department at Defendant's steel mill in Calvert, Alabama.  Byrd performed his job well.

11.    In December 2017, Defendant offered Byrd a caster job position.  Byrd provided a resume and met with his shift coordinator and several other Outokumpu administrative employees in the office.

12.    Byrd's interview went well and Defendant told Byrd he was hired. Defendant then told Byrd that he would need to get a physical and a drug test.

13.    On December 15, 2017, Karrie Walker, a Human Resources Specialist

3

in Defendant's HR department, emailed Byrd.  Walker said that Byrd's first day of work would be January 22, 2018.  Walker also gave Byrd information about where to go to get the physical and drug test.

14.     Defendant contracts with the Occupational Health Center to, *inter alia*, perform physical examinations and drug screens for prospective employees

15.     As required, on December 20, 2017, Byrd went to the Occupational Health Center ("OHC") in Mobile, Alabama.

16.     First, Byrd filled out some paperwork about his medical history.

17.     Next, a female OHC employee took Byrd back into an examination room.  This employee gave Byrd a hearing and vision screening.  She asked Byrd to squat once (bending at the knees) and twist at the waist once.  Byrd completed these screens with no difficulty.

18.     Then Byrd was given a drug screen, which he passed.

19.     After the drug screen, the same female OHC employee asked Byrd if he saw a Dr. McAlister.  Byrd said, "yes," and the OHC employee immediately stopped everything, telling Byrd that she could not perform his physical.

20.     Byrd never received a physical from OHC.

21.     No one from OHC asked Byrd about or talked with Byrd about his current job duties or the duties of the caster position.

4

22.    OHC asked Byrd to provide permission for OHC to get his medical records from Dr. McAlister, and Byrd signed the required release.

23.    Byrd sees Dr. McAlister for various medical conditions.  One condition is Byrd's knee function.  Byrd tore his ACL several years ago, and this injury can still limit Byrd in the major life activities of walking, running, standing, climbing, and bending.  Dr. McAlister has prescribed medication for Byrd, which he takes as directed.

24.    On December 28, 2017, Dr. McAlister provided a letter stating that Byrd can work without limitations or restrictions.

25.    On December 29, 2017, Walker emailed Byrd and asked for his phone number so she could call him.  During their subsequent phone call, Walker said Human Resources had some questions about Byrd's drug test.  Byrd said it was negative.  Walker agreed, but then asked about Byrd's prescriptions.  Byrd explained that he takes medications only as prescribed and that his doctor provided a note saying Byrd could do the job.  Walker said she would get back with Byrd.

26.    Walker did not talk with Byrd about any alleged restrictions or possible accommodations.

27.    Over the next week, Byrd tried to call Walker several times so he could make sure she had all the paperwork she needed from his doctor.  Byrd also wanted

5

to let her know he was ready to start the new hire training class.

28.    Because Walker did not return his phone calls, on January 8, 2018, Byrd emailed her.

29.    Byrd attached the December 28, 2017 letter from Dr. McAlister to the email and reiterated that he wanted Walker to have all the paper work from his doctor that she needed.  Byrd also said that he could start classes on January 22, 2018, and asked Walker to let him know if she needed anything else.

30.    Later on January 8, Walker emailed Byrd back.  She said that, "[b]ased on the information from our Outokumpu occupational health doctor, we will have to rescind the offer as we cannot accommodate as they required."

31.    Byrd was confused because the doctor at OHC did not evaluate him or talk with him about his job duties, abilities, accommodations, or restrictions.  Nor did the female OHC employee talk with him about those issues.  Further, Byrd's treating doctor had said that he could work without limitations or restrictions.

32.    Byrd called Walker and asked if he could get a second opinion.

33.    Walker said Byrd's doctor was not their doctor; the doctor from OHC was their doctor and that was the doctor they would be using.

34.    During this time, Byrd continued to work at the Outokumpu steel mill, employed through RHI.  He regularly worked with both RHI employees and

6

Outokumpu employees. Byrd began hearing other employees talk about his use of drugs and how it caused him to not be hired by Defendant.

35.    On information and belief, Walker and/or other Outokumpu employees unlawfully disclosed and failed to keep Byrd's medical record information confidential.

36.    Some co-workers avoided talking with Byrd after the disclosure and others would bring it up as a way to taunt Byrd. Supervisors also treated Byrd as if he was not a responsible employee and took tasks away from him, even though nothing about his job performance changed.

37.    Byrd felt stigmatized, even though his use of prescription medications was lawful.

38.    In March of 2018, Byrd voluntarily left RHI due to the ongoing harassment from Outokumpu employees and RHI employees that was based on the unlawful disclosure of his medical records information.

39.    Plaintiff is an individual living with a disability but is able to perform the essential functions of the job of caster (entry level operator in the Casting Department) for Outokumpu, with or without accommodation.

40.    Plaintiff's condition limits multiple major life activities, including but not limited to: walking, bending, and kneeling.

41.    Plaintiff has a history and record of disability, which was known by Defendant.

42.    Defendant perceived and/or regarded Plaintiff as disabled.

43.    In denying the Plaintiff employment and/or reasonable accommodations related thereto, Defendant intentionally, willfully, and maliciously discriminated against Plaintiff on the basis of his disability, his record of disability, and/or his perceived disability in complete disregard for his federally protected rights.

44.    Plaintiff was discriminated against because of his disability, his record of disability, and/or his perceived disability in violation of the Americans With Disabilities Act.

45.    As a result of Defendant's actions, Plaintiff has suffered extreme harm, including, but not limited to, loss of employment opportunities, denial of wages, compensation, and other benefits and conditions of employment.  Additionally, Plaintiff has suffered injury including pain, humiliation, emotional distress, mental anguish and suffering, and loss of enjoyment of life.

## V.    CAUSE OF ACTION

46.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 45 above with the same force and effect as if fully set out in specific detail herein below.

47.     Plaintiff is a person with a disability, has a history of disability, and/or is regarded as disabled.  *See* 42 U.S.C. 12102.

48.     Defendant is a covered entity and an employer in accordance with 42 U.S.C. 12111(5).

49.     Plaintiff is a qualified individual as defined under the ADA.  Despite Plaintiff's disability, with or without reasonable accommodation, he is able to perform the essential functions of the job of caster.  See 42 U.S.C. 12111.

50.     Under the ADA, Defendant is prohibited from discriminating against Plaintiff, a qualified individual, on the basis of disability in regard to, *inter alia*, job application procedures, hiring, termination, job training, and other terms, conditions, and privileges of employment.  42 U.S.C. 12112(a).

51.     The ADA's protection against discrimination extends to medical exams and inquiries (42 U.S.C. 12112(d)(1)) and the ADA further prohibits employers, such as Defendant, from "participating in a contractual or other arrangement that has the effect of subjecting a covered entity's qualified applicant or employee to . . . discrimination." 42 U.S.C. 12112(b)(2).

52.     Defendant's termination of Plaintiff and its refusal to allow Plaintiff to start his job as caster violated the ADA.

53.     Defendant also violated the ADA by failing to ensure that the results of

Plaintiff's medical examination were used in accordance with the ADA. 42 U.S.C. 12112(d)(3).

54.     Defendant unlawfully disclosed Plaintiff's medical information and failed to keep such information confidential. 42 U.S.C. 12112(d)(3).

55.     Defendant's refusal to make or consider reasonable accommodations, such as allowing him to obtain a second medical opinion/exam, also violated the ADA. Such accommodations would not have imposed an undue hardship on the operation of the Defendant's business.

56.     In terminating the Plaintiff, Defendant has maliciously, intentionally, and with reckless disregard discriminated against Plaintiff due to his disability, his record of disability, and/or his perceived disability; and has otherwise classified and segregated Plaintiff in a way that has adversely affected his job opportunities because of his disability, history of disability, and the perception of him as a person with a disability. *See* 42 U.S.C. 12112.

57.     As a proximate result, Plaintiff has suffered extreme harm including, but not limited to, loss of employment, denial of wages, compensation and other benefits and conditions of employment. Plaintiff has also suffered injury, including pain, humiliation, mental anguish and suffering.

## VI.   PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1.      Issue a declaratory judgment that the employment practices, policies, procedures, conditions, and customs that led to the discrimination by Defendant violate Plaintiff's rights as secured by the Americans with Disabilities Act, 42 U.S.C. §12101, et seq. ("ADA").

2.      Grant Plaintiff a permanent injunction enjoining Defendant, its agents, successors, employees, attorneys and those acting in concert with the Defendant and at the Defendant's request, from continuing to violate the ADA.

3.      Enter an Order requiring the Defendant to make Plaintiff whole by awarding Plaintiff reinstatement, back-pay (plus interest), loss benefits, compensatory and nominal damages.

4.      Plaintiff further prays for such other and further relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorney's fees and expenses incurred by this litigation.

5.      Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged in this suit, and this action for injunctive, declaratory and other relief is his only means of securing adequate relief.

11

**THE PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY.**

Dated October 30, 2020.

Respectfully submitted,

*/s/ Abby M. Richardson*
Abby M. Richardson (RICHA3209)
RICHARDSON LAW FIRM, LLC
118 N. Royal Street, Suite 100
Mobile, Alabama  36602
Telephone:  (251) 338-1695
Facsimile:   (251) 338-1698
Email:  abby@richardsonlawllc.com


*/s/Rachel L. McGinley*
Rachel L. McGinley (ASB-1892-A64M)
WIGGINS, CHILDS, PANTAZIS, FISHER, GOLDFARB
The Kress Building
301 19th Street North
Birmingham, Alabama  35203
(205) 314-0500
Email: rmcginley@wigginschilds.com


**PLEASE SERVE DEFENDANT BY**
**CERTIFIED MAIL, RETURN RECEIPT**
**REQUESTED AT THE FOLLOWING ADDRESS:**
Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, Alabama 36104

*/s/Rachel L. McGinley*
OF COUNSEL