# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **DANIEL BYRD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 20-0520-WS-M** |
| | ) |
| **OUTOKUMPU STAINLESS USA, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment. (Doc. 35). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 36, 37, 40, 41, 44), and the motion is ripe for resolution.[1] After careful consideration, the Court concludes the motion for summary judgment is due to be denied.

## BACKGROUND

According to the complaint, (Doc. 1), the defendant operates a steel mill in this District. The plaintiff was employed by RHI, a contractor for the defendant, working on-site in the caster department. The defendant eventually offered the plaintiff a caster job position. The defendant sent the plaintiff to Occupational Health Center ("OHC") for a physical and drug test, which the plaintiff passed. However, when the defendant learned that the plaintiff was prescribed certain prescription medication,[2] it rescinded its employment offer. The medication at

---

[1] The defendant has also filed a motion to strike certain portions of the plaintiff's declaration. (Doc. 45). That motion as well is fully briefed and ripe for resolution. (Docs. 47, 48).

[2] The complaint does not identify the medication at issue, but the parties agree it was hydrocodone.

issue was prescribed by a medical doctor due to a knee injury the plaintiff experienced years ago, which injury limits the plaintiff in several major life activities.

The complaint asserts multiple violations of the Americans with Disabilities Act ("ADA").  First, that the defendant discriminated against the plaintiff on the basis of disability by failing to hire him.[3]  Second, that the defendant failed to make or consider reasonable accommodations in the application process.  Third, that the defendant unlawfully disclosed the plaintiff's medical information and/or failed to keep that information confidential.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if

---

[3] The complaint describes this both as a termination claim and as a failure-to-hire claim.  The plaintiff's brief settles on the latter terminology.

any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

 "If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

 In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). "Therefore, the [non-movant's] version of the facts (to the extent supported by the record) controls, though that version can be supplemented by additional material cited by the [movants] and not in tension with the [non-movant's] version." *Rachel v. City of Mobile*, 112 F. Supp. 3d 1263, 1274 (S.D. Ala. 2015), *aff'd*, 633 Fed. Appx. 784 (11th Cir. 2016).

 "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *accord Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014). The Court accordingly limits its review to those arguments the parties have expressly advanced.

**I. Discriminatory Failure to Hire.**

"No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring … of employees, … and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).[4]

"Under the controlling law in this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims."  *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) (internal quotes omitted).  "Under that framework, [the plaintiff] must first establish a prima facie case of disability discrimination.  To do that, she must show that she (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of her disability."  *Todd v. Fayette County School District*, 998 F.3d 1203, 1215-16 (11th Cir. 2021).  If the plaintiff makes such a showing, "the burden of production shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for its actions."  *Id*. at 1216 (internal quotes omitted).  "And if [the defendant] satisfies that requirement, the burden shifts back to [the plaintiff] to show that the reasons [the defendant] articulated are merely a pretext for discrimination."  *Id*.

**A. Prima Facie Case.**

**1. Disability.**

The term "disability" can mean any of three things.  First, it can mean "a physical or mental impairment that substantially limits one or more major life activities of" the plaintiff, 42 U.S.C. § 12101(1)(A), which is referred to as an "actual disability."  *EEOC v. STME, LLC*, 938 F.3d 1305, 1315 (11th Cir. 2019).  Second, it can mean "being regarded as having such an impairment."  42 U.S.C. §

---

[4] The defendant concedes it is a covered entity.

4

12101(1)(C).  Third, it can mean "a record of such an impairment."  *Id*. §
12101(1)(B).

   Per the plaintiff's evidence, he has experienced chronic knee pain for
years, since partially tearing his right ACL in high school.  Without mitigating
measures, this pain limits the plaintiff's ability to bend, squat, and climb stairs and
causes him to experience extreme difficulty sleeping.  The plaintiff is followed by
a medical doctor (Dr. McAlister) for pain management, and he has long been
prescribed hydrocodone for pain.  (Doc. 37-1 at 37; Doc. 41-3 at 7-8, 29; Doc. 41-
22 at 3).  The plaintiff identifies his actual disability as "chronic knee pain," and
he identifies his "perceived" disabilities as "conditions requiring pain management
and use of potentially sedating medications."  (Doc. 40 at 25).

   The defendant makes no argument that the plaintiff is not disabled as
defined by the ADA.


### 2.  Qualified individual.

   A "qualified individual" is "an individual who, with or without reasonable
accommodation, can perform the essential functions of the employment position
that such individual holds or desires."  42 U.S.C. § 12111(8).  "For the purposes of
this subchapter, consideration shall be given to the employer's judgment as to
what functions of a job are essential …."  *Id*.

   However, unlawful discrimination includes "using qualification standards
… that screen out or tend to screen out an individual with a disability … unless the
standard …, as used by the covered entity, is shown to be job-related for the
position in question and is consistent with business necessity …."  42 U.S.C. §
12112(b)(6).  "By that same definition, … as well as by separate provision, §
12113(a), the Act creates an affirmative defense for action under a qualification
standard 'shown to be job-related for the position in question and … consistent
with business necessity.'"  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78
(2002) (quoting 42 U.S.C. § 12113(a)).  For this purpose, "[t]he term

'qualification standards' may include a requirement that an individual shall not
pose a direct threat to the health or safety of other individuals in the workplace."
42 U.S.C. § 12113(b).  By regulation, upheld in *Echazabal*, 536 U.S. at 76, the
defense extends to risks posed to the individual at issue.  29 C.F.R. §
1630.15(b)(2) (2021).

Subject to certain restrictions, "[a] covered entity may require a medical
examination after an offer of employment has been made to a job applicant … and
may condition an offer of employment on the results of such examination …."  42
U.S.C. § 12112(d)(3).  The defendant extended the plaintiff an offer of
employment as an entry operator, conditioned on the results of such an
examination by OHC, a third-party provider of such services.  (Doc. 37-2 at 6).
Following this examination, OHC issued to the defendant two reports, each of
which contained the following language:

> No safety sensitive work.  No lifting greater than 40 lbs., no
> repetitive bending, no operating heavy equipment, no working from
> unprotected heights or over open waters due to the regular use of
> potentially sedating medications.

One of these statements was framed as a recommendation, the other as a required
accommodation.  (Doc. 41-9 at 4, 6).  The "potentially sedating medication" at
issue is hydrocodone.  (Doc. 37-7 at 6).

The defendant asserts that the plaintiff is not a "qualified individual"
because, due to his use of hydrocodone, he poses a "direct threat" to the safety of
himself and others.  The defendant points out that the position offered the plaintiff
is in the melt shop, where employees work with molten steel, with and around
heavy machinery, and at heights.  The defendant contends that working safely in
such an environment is an essential function of the position.  (Doc. 36 at 16-19).

To demonstrate that the plaintiff's use of hydrocodone would render him a
direct threat to himself and others, and thus not a qualified individual for the
position of entry operator, the defendant relies on the OHC reports and the
plaintiff's testimony.  (Doc. 36 at 19; Doc. 44 at 4-5).  According to the defendant,

the plaintiff "admit[ted]" under oath that hydrocodone "cause[s] him to experience drowsiness." (*Id.*). The deposition testimony on which the defendant relies for this proposition, (Doc. 36 at 5), does not support it. The sum total of that testimony is as follows:

> Q.   And as we sit here today, how frequently or how often are you needing the hydrocodone or Norcos?
> A.   I take them every night.
> Q.   And what is the purpose of your taking the hydrocodone every night?
> A.   To be able to sleep from pain.

(Doc. 37-1 at 4-5). This testimony establishes that the plaintiff takes hydrocodone in order to sleep, but it does not state what it is about the hydrocodone that allows him to sleep. Since the intended function of hydrocodone is to reduce pain, the plaintiff's testimony may reasonably be read as saying only that the hydrocodone enables him to sleep by cutting his pain sufficiently that the pain does not keep him awake. Even if the defendant's construction of the testimony is a reasonable one, it is not the only reasonable one, and no jury could be compelled to accept the defendant's construction. Even had the plaintiff admitted that hydrocodone makes him drowsy when he takes it at night, he patently did not admit that he remains drowsy when he enters the work space the following day. The plaintiff's testimony, in short, does not negate his status as a qualified individual.

"Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r) (2021).

> The determination that an individual poses a "direct threat" *shall be based on an individualized assessment* of the individual's present ability to safely perform the essential functions of the job. This assessment *shall be based on a reasonable medical judgment* that *relies on the most current medical knowledge and/or on the best available objective evidence*. In determining whether an individual would pose a direct threat, the factors to be considered include:
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and
(4) The imminence of the potential harm.

*Id*. (emphasis added).  The defendant says that OHC "conducted an individualized assessment," (Doc. 36 at 19), but the Court cannot agree.

Ruth Sesera examined the plaintiff and created the reports quoted above. Sesera identified her analytical process as follows:

> From my experience as a certified registered nurse practitioner, I am aware that Hydrocodone has sedating side effects.  Attachment D to my declaration is a true and correct copy of the package insert for Hydrocodone.  Within the side effects listed for Hydrocodone is drowsiness.  This is why I noted potentially sedating side effects.

(Doc. 37-7 at 6).  When Sesera subsequently received medical records and a brief letter from Dr. McAlister that "did not provide me with any specific information about how frequently Mr. Byrd took Tramadol or Hydrocodone in December 2017, or when Mr. Byrd took such medication," she "concluded that Mr. Byrd should not be cleared to perform safety-sensitive duties," (*id*.), because the use of hydrocodone "could cause him to be drowsy and not alert."  (Doc. 36 at 11).

"To prevent the very reliance on stereotype and related perceptions of an individual's limitations that the ADA prohibits, an employer [asserting a direct threat] must point to *particularized facts* about the *specific person*'s condition to support its decision."  *Lowe v. Alabama Power Co*., 244 F.3d 1305, 1308 (11th Cir. 2001) (emphasis added).  Thus, "[a]n employer may not rely upon the recommendation of a physician who … conducts a cursory examination and bases his opinion at least in part on a general assumption that all patients with the same disability have the same limitations."  *Pollard v. Drummond Co*., 2015 WL 5306084 at *7 (N.D. Ala. 2015) (describing *Lowe*).  The same principle applies to the use of medications.  *Id*. ("[A]n assessment based on the known possible side effects of a medication, as opposed to an individualized inquiry into a patient's present ability to perform his job functions, is insufficient.").

8

In this case, Sesera's recommendation that the plaintiff be excluded from safety-sensitive work was based only on a product packet identifying drowsiness as a potential side effect of hydrocodone and on the failure of Dr. McAlister to provide her with information regarding the frequency and timing of the plaintiff's use of hydrocodone. There is no evidence that Sesera knew anything about hydrocodone beyond what she had read on a package insert. There is no evidence that she asked either Dr. McAlister or the plaintiff himself to identify the frequency and timing of his use of hydrocodone. There is no evidence that she asked either Dr. McAlister or the plaintiff himself about his actual experience with hydrocodone, including any side effects.[5] Because she notes that she received no information about the timing of the plaintiff's taking of hydrocodone, there is evidence she realized that the length of time between taking the medication and beginning a work shift is an important consideration. And, by her own testimony, she knew that drowsiness is not a universal side effect but only a "potential[l]" one.

Courts facing similar evidence have routinely declined to rule that a "direct threat" determination was supported by the legally required "individualized assessment" reflecting a "reasonable medical judgment." *See, e.g., Hixon v. Tennessee Valley Authority Board of Directors*, 504 F. Supp. 3d 851, 863-64 (E.D. Tenn. 2020) (reliance on the fact that Marinol "can" cause serious side effects, without knowing whether the plaintiff had experienced any of them, and without even asking him if he had, was not an individualized assessment); *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 520-21 (W.D. Pa. 2010) (where the

---

[5] On the contrary, the plaintiff has denied that Sesera asked him how often he took hydrocodone or at what time of day, whether and for how long he had experienced drowsiness or any other reaction to the hydrocodone, or any other question relative to his use of the medication. (Doc. 41-22 at 3-4). The defendant moves to strike this evidence as "irrelevant and immaterial" in light of the plaintiff's "own sworn testimony that Hydrocodone made him drowsy." (Doc. 45 at 6). As discussed in text, no such testimony exists.

opining physician had general knowledge about the effects of methadone but, despite knowing that every situation involving methadone is unique and involves various considerations, did not conduct a neurological exam of the plaintiff and did not ask the plaintiff, his drug counselor, or his treating physician about any effects or complications the plaintiff might have experienced, and where the examination of the plaintiff revealed no methadone-related side effects, the court could not say as a matter of law that an individualized assessment had occurred); *Haynes v. City of Montgomery*, 2008 WL 4495711 at *4-5 (M.D. Ala. 2008) (where the examining physician's knowledge of side effects from the plaintiff's medication came from general prescription information, he was unaware of any studies regarding side effects, he knew that side effects vary among individuals, and he did not test the plaintiff regarding side effects or even speak with him about his experience with the medication, there was no individualized assessment), *aff'd*, 344 Fed. Appx. 519 (11th Cir. 2009); *cf. Howard v. Norfolk Southern Corp.*, 2020 WL 5569922 at *15 (N.D. Ala. 2020) (that the employee's use of oxycodone and morphine violated the defendant's medical guidelines did not amount to an individualized assessment).[6]

The Court concludes that the foregoing cases accurately reflect the proper analysis of "direct threat" arguments in the context of prescribed medication.[7]   The

---

[6] The plaintiff raised *Pollard* and *Haynes* in his brief, (Doc. 40 at 20), and the defendant has not effectively addressed them.  (Doc. 44 at 6).

[7] In *Goff v. Performance Contractors, Inc.*, 2020 WL 1794967 (S.D. Ala. 2020), the defendant's medical contractor recommended safety-sensitive restrictions on the plaintiff, due to his extended use of Norco, even though the contractor did not examine the plaintiff, did not rigorously examine his capabilities and limitations, and did not consult his personal physician or medical records, and even though the contractor relied only on the packaging insert and on a medical society's guidance that chronic opioid use is "not recommended" for patients in safety-sensitive positions.  *Id*. at *3 & n.6, *4, *8. This Court ruled that the contractor's recommendation was "precisely the sort of individualized determination on which employers are permitted to rely in withdrawing an offer of employment."  *Id*. at *11 (internal quotes omitted).  While this discussion occurred in the context of whether the plaintiff was a "qualified individual," *id*. at *8, the Court did not address the "direct threat" analysis or Section 1630.2(r), and it made no

Court further concludes that, applying that analysis to this case, OHC's reports do not establish as a matter of fact or law that the plaintiff was a direct threat and thus not a qualified individual.

Although the defendant labels its argument as being that the plaintiff is not a qualified individual "because he was a direct threat to himself and others," (Doc. 36 at 16), it concludes this section of its brief with the alternative assertion that, "even if Plaintiff did not pose a direct threat," the restrictions recommended by OHC "prevented him from performing certain essential functions of an Entry Operator" and thus preclude him from being a "qualified individual." (*Id*. at 19). In presenting this argument, the defendant relies on this Court's decision in *Goff v. Performance Contractors, Inc*., 2020 WL 1794967 (S.D. Ala. 2020).

In *Goff*, the defendant's medical contractor recommended "safety-sensitive restrictions" on the plaintiff due to his extended use of Norco. 2020 WL 1794967 at *3. Those restrictions included prohibitions on lifting over 20 pounds, working at heights over six feet, and operating machinery. *Id*. at *8. Lifting over 50 pounds daily, working at heights daily, and operating machinery almost daily were all essential functions, so the safety restrictions precluded the plaintiff from performing several essential functions of the position. *Id*. The plaintiff in *Goff* provided evidence that he physically could lift over 50 pounds and climb ten feet, but this did not draw into question the medical evidence that he could not do so safely, which was the basis of the restrictions. *Id*. at *8 n.15. The defendant appears to believe that *Goff* stands for the proposition that a medical provider's recommendation of restrictions incompatible with the plaintiff's performance of one or more essential functions of the position irrebuttably establishes that the plaintiff is not a qualified individual. *Goff*, however, neither states nor supports any such proposition; instead, it is based only on the plaintiff's failure to

---

ruling based on them. To whatever extent *Goff* can be read as employing a different direct threat analysis than that described in this opinion, the Court retreats from it.

effectively challenge the restrictions.  Here, the plaintiff has effectively challenged the restrictions by showing they are not the produce of an individualized assessment.  To the uncertain extent the defendant suggests it can render unsupported restrictions conclusive of the "qualified individual" question simply by "rely[ing] on" them, (Doc. 36 at 19), the Court rejects the suggestion as entirely unsupported by authority or reason.

The defendant admits that all restrictions recommended by OHC were based on safety concerns arising from the plaintiff's use of hydrocodone and not on any physical limitations.  (Doc. 36 at 11, 19; Doc. 37-7 at 6).  The defendant has not explained how such restrictions can properly be analyzed for "qualified individual" purposes outside the "direct threat" paradigm but, even if they may, the defendant has not shown that the superficial treatment provided by OHC could suffice to preclude "qualified individual" status as a matter of law.  This is especially so given:  the plaintiff's testimony that he only took hydrocodone at night (hours removed from the defendant's workplace); the testimony of the defendant's corporate representative that the defendant allows pain medication to be taken eight hours before a shift begins; and the testimony of Matt Dickson, RHI's site and safety coordinator, that the plaintiff worked two years in the melt shop[8] without ever appearing sleepy or sedated.  (Doc. 37-1 at 4; Doc. 41-1 at 47-49; Doc. 41-18 at 4, 16-17).[9]

_____

[8] The defendant agrees that the plaintiff's work as an RHI employee was performed in the melt shop, and it insists that all positions in the melt shop are safety-sensitive.  (Doc. 36 at 3; Doc. 44 at 2).  The defendant stresses that the plaintiff's job involved less heat, height and machinery than that of an entry operator, but the point is that the defendant performed for an extended period in a safety-sensitive environment without any evidence of drowsiness or sedation.

[9] As noted, a qualified individual is one who, "with or without reasonable accommodation," can perform the essential functions of the position at issue.  42 U.S.C. § 12111(8).  The defendant objects that the plaintiff has identified no reasonable accommodation that would enable him to perform the safety-sensitive functions of the entry operator position.  (Doc. 36 at 20).  Under the plaintiff's evidence, however, he

### 3. Discrimination on the basis of disability.

The Court has previously expressed uncertainty regarding the scope of the final element of a disability discrimination plaintiff's prima facie case:

> While the third element of the plaintiff's prima facie case is phrased as whether she "was discriminated against based upon [her] (real or perceived) disability," that is actually the ultimate question in a discrimination case, and a plaintiff need not prove her entire case at this early stage.  As the Eleventh Circuit has noted, "[w]e cannot reconcile a rule that would essentially require a plaintiff to prove pretext as part of his prima facie case at the summary judgment stage with the Supreme Court's instruction that the plaintiff's burden is not onerous."  *Vessels* [*v. Atlanta Independent School System*, 408 F.3d 763, 769 (11th Cir. 2005)].  On the contrary, the limited function of the prima facie case is only that of "eliminating the most common nondiscriminatory reasons for" the adverse employment action.  *Holland* [*v. Gee*, 677 F.3d 1047*,* 1055 (11th Cir. 2012)] (internal quotes omitted).

*Whitt v. Baldwin County Mental Health Center*, 2013 WL 6511856 at *17 (S.D. Ala. 2013).  The Court, however, need not map the precise contours of the third element, because the defendant plainly fails to challenge it effectively.

In a single sentence, the defendant asserts that "[t]here is no evidence that [the defendant] treated Plaintiff less favorably than any other applicant based on knowledge of any alleged disability."  (Doc. 36 at 21).  Even indulging the dubious assumption that a comparator is necessary, the defendant points neither to evidence negating the existence of a comparator nor to evidence demonstrating the plaintiff will be unable to produce one at trial.  As the Court has noted, "it is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Mullins*, 228 F.3d at 1313 (internal quotes omitted).  The defendant's *ipse dixit* passes no burden to the plaintiff to present evidence of a comparator in order to avoid summary judgment.

---

needs no accommodation, since his use of hydrocodone does not interfere with his ability to work safely.

The defendant's only other argument against the plaintiff's prima facie case is that he has admitted his lack of evidence that the defendant rescinded its offer due to his alleged disability. (Doc. 36 at 21). All that the evidence to which the defendant cites actually says, however, is that no one associated with the defendant ever *told* the plaintiff he had been rejected because of a disability. (*Id*. at 14-15).

In its reply brief, the defendant announces that "[t]here is no evidence that [the defendant] had any knowledge that [the plaintiff's] knee condition rose to the level of an ADA-qualifying disability." (Doc. 44 at 6-7). Although unnoted by the defendant, the decisionmaker's awareness of the plaintiff's actual disability at the time of the challenged employment decision is part of the "because of" analysis of the prima facie case. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005); *Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996). For several reasons, however, the argument is unavailing.

First, the defendant did not deny awareness of the plaintiff's disability until its reply brief. As this Court has repeated many times, "[d]istrict courts, including this one, ordinarily do not consider arguments raised for the first time on reply." *Scott v. ILA Local 140 International Longshoremen's Association*, 449 F. Supp. 3d 1270, 1273 (S.D. Ala. 2020) (internal quotes omitted). The defendant has offered no excuse for not raising this argument in its principal brief and no reason the Court should consider it now.

Second, the defendant again contents itself with an *ipse dixit*, without pointing to evidence that negates its knowledge or demonstrates that the plaintiff cannot present evidence of knowledge. As addressed above, such superficial treatment does not suffice to carry the defendant's initial burden on motion for summary judgment.

Third, regardless of whether the defendant knew the plaintiff was actually disabled, there is evidence that it regarded the plaintiff as disabled, and the defendant would necessarily be aware that it so regarded the plaintiff. In *Haynes*

*v. City of Montgomery*, 344 Fed. Appx. 519 (11th Cir. 2009), the defendant hired a doctor to evaluate the plaintiff, and the doctor "would not have cleared [the plaintiff] to work in any safety-sensitive position or drive a vehicle of any kind," because of his prescription medication.  *Id*. at 520.  The Eleventh Circuit construed this restriction as reflecting the doctor's perception that the plaintiff was "substantially limited from performing a broad range of jobs," *id*., which meant he perceived that the plaintiff was substantially limited in the major life activity of working,[10] which meant he regarded the plaintiff as disabled.[11]  Because the defendant "relied on the doctor's evaluation of [the plaintiff] in deciding not to return [him] to duty," there was evidence that the defendant shared the doctor's perception and made its employment decision based on that perception.  *Id*.[12]  The defendant recognizes *Haynes* as setting forth the governing analysis but argues that the evidence in this case negates any inference that OHC regarded the plaintiff as disabled.  (Doc. 44 at 7).  The critical distinction, the defendant says, is that OHC considered the position for which the plaintiff was applying.  That appears to have been true also in *Haynes* but, in any event, any exclusion from all safety-sensitive work would appear to reflect a substantial limitation in the major life activity of working, because such positions cover a "broad range of jobs."

---

[10] *E.g., D'Angelo v. ConAgra Foods, Inc*., 422 F.3d 1220, 1227 (11th Cir. 2005).

[11] 42 U.S.C. § 12102(1)(A) (defining "disability" as an impairment "that substantially limits one or more major life activities of such individual").

[12] As the trial court phrased it, "By sending Mr. Haynes to Dr. Turner and relying on Dr. Turner's perception in refusing to clear Mr. Haynes for duty, the jury could have concluded that the City adopted Dr. Turner's perception that Mr. Haynes had a disability."  *Haynes*, 2008 WL 4495711 at *3.  *See also Lisby v. Tarkett, Inc*., 2020 WL 1536386 at *5 (N.D. Ala. 2020) (where an occupational physician performing a pre-employment physical recommended a total and immediate restriction of safety sensitive work based on the plaintiff's legal use of methadone, there was a reasonable inference that he and the employer perceived the plaintiff as disabled).

*Haynes*, 344 Fed. Appx. at 520.[13]  Certainly the defendant has failed to demonstrate the opposite.

### B.  Legitimate, Non-Discriminatory Reason.

The defendant identifies its legitimate, non-discriminatory reason for rescinding its offer of employment as being that "OHC, a third-party medical professional, informed [the defendant] that after conducting a pre-hire medical screening, it determined Plaintiff could not perform the safety-sensitive functions of an Entry Operator."  (Doc. 36 at 21; *see also id*. at 25 (the defendant's legitimate, non-discriminatory reason is that the plaintiff "was not cleared by OHC to perform work in a safety-sensitive environment").

### C.  Pretext.

At the third stage of the analysis, the question becomes whether "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252 (1981).  The plaintiff "must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.  This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination."  *Id*. at 255.  The plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*.; *accord Kragor v. Takeda Pharmaceuticals America, Inc*., 702 F.3d 1304, 1308

---

[13] "[W]e conclude that [the plaintiff] has established that [the defendant] regarded him as having a disability that substantially limited the major life activity of work, because the evidence suggests that [the defendant's medical advisor] thought he was substantially limited in his ability to perform any of a broad range of safety-sensitive jobs."  *Shiplett v. National Railroad Passenger Corp*., 1999 WL 435169 at *8 (6th Cir. 1999).

(11th Cir. 2012); *Jackson v. State Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005). Whichever approach is taken, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (en banc).

When a plaintiff employs the indirect approach, "[t]he inquiry into pretext requires the court to determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct" but "were a pretext for [discrimination]." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (internal quotes omitted). The plaintiff's burden is to "demonstrate weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1279 (11th Cir. 2008). To make this showing, the plaintiff may resort to "all the evidence," *Crawford*, 529 F.3d at 976, including "the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 143 (2000).

As the plaintiff notes, (Doc. 40 at 26 n.41), "[t]he evidence tending to prove the 'regarded as' definition of disabled … often is duplicative of the evidence relevant to" whether the defendant's employment decision was based on the plaintiff's perceived disability. *Lewis v. City of Union City*, 934 F.3d 1169, 1184 (11th Cir. 2019). This is consistent with *Haynes*, which ruled that the same evidence supporting a finding that the defendant perceived the plaintiff as disabled (its reliance on an outside doctor's proposed exclusion of the plaintiff from safety-sensitive work based on his prescription medication) also supported a finding that

"that perception prompted [the defendant] to terminate [the plaintiff's] employment, not the desire of [the defendant] to ensure the safety of" the plaintiff or others.  344 Fed. Appx. at 520.  The plaintiff's evidence mirrors that of *Haynes* and thus furnishes evidence of pretext.

The plaintiff next argues that a failure to conduct an individualized assessment as required by "direct threat" analysis is evidence that the employer acted based on what it regarded as a disability.  (Doc. 40 at 26 & n.41).  The plaintiff's position is again supported by authority.  *See Howard*, 2020 WL 5569922 at *16 (evidence that the defendant "may have improperly disqualified Plaintiff from all safety-sensitive jobs at Norfolk by failing to properly conduct an individualized inquiry into his disability" constituted evidence that the defendant "discriminated against him because of his disability").  Because, as addressed in Part I.A.2, the plaintiff has evidence that no individualized assessment was undertaken, he also has evidence of pretext.

The defendant says it was free to rely on OHC's restrictions as long as it did so in "good faith."  (Doc. 36 at 26).  In *Lowe*, however, the Eleventh Circuit rejected a subjective good faith standard.  Instead, an employer's decision that an employee is "not able to perform the … position safely" must be based "on particularized facts using the best available objective evidence."  244 F.3d at 1309.  The employer's "good-faith and honest belief" that the employee could not so perform, *id*. at 1308, which was based on a physician's dated and cursory examination of the plaintiff, coupled with his assumption that all double amputees have the same limitations, was inadequate because not "reasonably based on particularized facts."  *Id*. (internal quotes omitted).  As other appellate courts have phrased it, "'an employer cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions.'"  *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 484

(5th Cir. 2006) (quoting *Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 31 (1st Cir. 2002)).[14]

As addressed in Part I.A.2, there is strong evidence that OHC's restrictions were not reasonably derived. To the uncertain extent that *Lowe* requires that the employer be on notice of deficiencies in the medical opinion, the defendant had such notice. The reports from OHC were sent to Karrie Walker, a human resources manager for the defendant. Walker reviewed these documents, concluded from them that the job offer would have to be rescinded, and so notified the plaintiff. (Doc. 41-21 at 5, 22-23, 25, 38, 40). These reports expressly tie the restrictions identified therein to safety concerns and expressly tie those concerns to merely "potentially" sedating medications – language revealing OHC's failure to obtain plaintiff-specific information, despite his "regular [and thus longitudinal] use" of the medication. (Doc. 41-9 at 4, 6).

The plaintiff offers additional evidence and argument regarding pretext. (Doc. 40 at 19-30). The Court need not consider this material, because the foregoing discussion demonstrates that a properly functioning jury could determine that the defendant revoked the plaintiff's job offer because it regarded him as disabled.

## II. Reasonable Accommodation in the Application Process.

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity …." 42 U.S.C. § 12112(b)(5)(A).

---

[14] The defendant relies for its "good faith" standard on *Goff*, 2020 WL 194967 at *12. To the extent *Goff* may be read as endorsing a standard lower than that required by the Eleventh Circuit in *Lowe*, the Court retreats from it.

A reasonable accommodation claim does not employ the burden-shifting analysis of other ADA discrimination claims. *Holly*, 492 F.3d at 1262. "Thus, an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Id*. (emphasis in original).

Section 12112(b)(5)(A) expressly extends the reasonable accommodation requirement to "applicant[s]." Reasonable accommodation includes "[m]odifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires …." 29 C.F.R. § 1630.2(o)(1)(i) (2021). The complaint identifies the reasonable accommodation at issue as "allowing [the plaintiff] to obtain a second medical opinion/exam." (Doc. 1 at 10).

In its principal brief, the defendant argues that "the *only* proposed accommodation is the elimination of the 'safety-sensitive' portion of the Entry Operator job, or other jobs for which Plaintiff may have been qualified." (Doc. 36 at 24 (emphasis in original)). The defendant argues this would not be a reasonable accommodation because it would require it to remove from the job of entry operator multiple essential functions of the position (such as working at heights or with heavy machinery). For the same reason, this accommodation would have worked an undue hardship on the defendant. (*Id*.).

As noted above, the accommodation proposed by the plaintiff was not to eliminate any function, essential or otherwise, of the entry operator position. Instead, it was to obtain an additional evaluation and opinion so that the plaintiff could demonstrate he could safely perform the essential functions of the position. The defendant's attack on the plaintiff's reasonable accommodation claim

20

completely misses the mark and thus is incapable of demonstrating the defendant's entitlement to summary judgment.[15]

In its reply brief, the defendant attempts to correct its error, for the first time addressing the plaintiff's actual reasonable accommodation claim.  (Doc. 44 at 11-12).  As noted previously, the Court ordinarily does not consider arguments first raised in a reply brief.  The defendant offers no reason the Court should stray from this position, and the Court can discern none – especially since the complaint explicitly identified the accommodation at issue as "allowing [the plaintiff] to obtain a second medical opinion/exam."  (Doc. 1 at 10).

Even were the Court to consider it, the defendant's tardy argument would fail.  The failure of OHC to conduct an individualized assessment of the plaintiff with respect to his use of hydrocodone and the side effects (if any) he experienced therefrom, is addressed in Part I.A.2.  Around the same time, Dr. McAlister wrote a brief "to whom it may concern" letter, in which he stated he had recently examined the plaintiff and found him to be "doing fine."  Dr. McAlister opined that the plaintiff "is capable of doing his daily job duties with no limitations or restrictions," and he offered to provide additional information upon request.  (Doc. 41-10).  OHC received this letter but afforded it little if any weight, since it did not expressly address the plaintiff's use of hydrocodone or reflect Dr. McAlister's awareness of the plaintiff's job requirements.  (Doc. 37-7 at 6).  There is no evidence that OHC ever requested Dr. McAlister to address such matters.  The plaintiff routed this letter to Walker and informed her that his doctor would provide her anything else she might need.  (Doc. 41-12).  Five minutes later, the defendant rescinded its job offer, "[b]ased on the information from our … occupational health doctor."  (*Id*.).  The plaintiff promptly called Walker and

---

[15] The only other reasonable accommodation argument the defendant raised in its principal brief is that the plaintiff is not a "qualified individual."  (Doc. 36 at 22).  As explained in Part I.A.2, a properly functioning jury could find that the plaintiff is a qualified individual.

"asked her for a second opinion, and she refused," saying that OHC "was their doctor, they didn't use anybody else." (Doc. 41-3 at 37, 41).

Based on the foregoing, the plaintiff has evidence that he, as a qualified individual with a disability, requested an accommodation in the application process and was denied that accommodation. The only remaining question is whether his requested accommodation was a reasonable one.[16]

The defendant in its reply brief belatedly denies the reasonableness of the plaintiff's proposed accommodation on several grounds. First, the defendant argues there is no "obligation" under the ADA to provide an additional medical exam. (Doc. 44 at 11). The plaintiff, (Doc. 40 at 15), points to *Lisby v. Tarkett, Inc.*, 2020 WL 1536386 (S.D. Ala. 2020), in which the Court ruled that the plaintiff's request for "a second unbiased [medical] opinion" could constitute a reasonable accommodation. *Id*. at *9. The defendant does not deny that *Lisby* was correctly decided but insists it is inapposite because it involved an outside physician who may have been biased against the plaintiff, *id*. at *3, as opposed to an outside health care provider who failed to perform a legally adequate individualized assessment. (Doc. 44 at 11). The defendant offers no explanation why a second medical opinion to counter a fatally flawed first opinion is reasonable as to some fatal flaws but not as to others.[17] On the contrary, Walker (testifying as the defendant's Rule 30(b)(6) representative) agreed that obtaining an additional medical evaluation could be a reasonable accommodation. (Doc. 37-6 at 33).

Second, the defendant argues that an additional medical examination and opinion would be an unreasonable accommodation because Dr. McAlister "had

---

[16] The defendant makes no argument that a second exam and opinion would impose an undue hardship.

[17] As discussed in Part I.C, Walker was on notice that OHC's recommended restrictions were based on safety concerns but were not based on the legally required individualized assessment of the plaintiff.

had the opportunity to weigh in regarding his condition." (Doc. 44 at 11). Dr. McAlister had not in fact had an opportunity to "weigh in," for at least two reasons. First, because there is no evidence that Dr. McAlister knew that OHC and the defendant would focus on possible side effects from hydrocodone, he had no notice he needed to address it. Second, because Walker explicitly stated, as a global proposition, that the defendant does not consider opinions other than OHC's, presenting his assessment as to hydrocodone's side effects on the defendant would have been futile.

Third, the defendant, citing *Goff*, argues it cannot be a reasonable accommodation to require an employer to "jettison" the opinion of its handpicked outside medical consultant. (Doc. 44 at 12). All that *Goff* says, however, is that the plaintiff in that case "cite[d] no authorities lending support" to such a proposition. 2020 WL 1794967 at *9. The plaintiff in this case has cited *Lisby* in support and, as noted, the defendant has not challenged *Lisby* as wrongly decided. To the uncertain extent that *Goff* may be read as broadly as the defendant proposes, the Court retreats from it.

Finally, the defendant argues that the proposed accommodation was futile because, given that the plaintiff "admittedly … experiences sedative side effects" from hydrocodone, a second exam and opinion could not have altered the defendant's employment decision. (Doc. 44 at 12). As explained in Part I.A.2, no such admission exists, and the defendant's futility argument thus fails.

## III. Disclosure of Confidential Medical Information.

Subject to requirements not at issue here, a covered entity "may require a medical examination after an offer of employment has been made to a job applicant …, and may condition an offer of employment on the results of such examination, if … information obtained regarding the medical condition or history of the applicant is … treated as a confidential medical record …." 42 U.S.C. § 12112(d)(3)(B). The complaint alleges that the defendant violated this provision

by disclosing his medical information and failing to keep it confidential.  (Doc. 1 at 10).  The defendant does not contest the existence of a private cause of action for violations of this provision.  Instead, it denies that the plaintiff has evidence with which to prove a violation.

There is evidence that some persons at the mill understood the plaintiff had not been hired due to his medications.  First, an electrician employed by the defendant told the plaintiff that someone asked over the radio who was coming in on the next shift and, when the answer was "Daniel," someone said, "Oh, the one who can't pass a drug test."  (Doc. 37-1 at 82).  Second, another electrician employed by the defendant told the plaintiff there was a rumor going around in the administration building that the plaintiff had "too much medication going on" and so the defendant couldn't hire him.  (*Id*. at 83).[18]  Third, Dickson heard someone say over the radio, "Where is that druggie at?"  (Doc. 41-18 at 27).  The plaintiff, who was with Dickson at the time, became angry and said, "I'm tired of hearing that," so Dickson assumed the reference was to the plaintiff.  (*Id*.).[19]  Finally, according to the plaintiff, Steve Zielinski, a team leader employed by the defendant, "went to my boss and told her that I was on four or five different

---

[18] The defendant complains that these two pieces of evidence are "hearsay and/or otherwise inadmissible."  (Doc. 44 at 13).  The argument fails for several reasons.  First, the defendant itself presented this evidence to the Court.  (Doc. 36 at 13).  Second, calling evidence "inadmissible" does not suffice to register an objection.  Third, the defendant offers no argument in support of its objection, and the Court declines to supply it on the defendant's behalf.

[19] The defendant suggests that Dickson's testimony also is hearsay, (Doc. 44 at 13), but it is not.  Hearsay is confined to material "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2).  The plaintiff does not offer Dickson's testimony to prove that he is a druggie but to show he was being described as a druggie.

medications and they couldn't hire me." (Doc. 37-1 at 95; Doc. 41-3 at 40; Doc. 41-22 at 2).[20]

The defendant has failed to present evidence excluding it as the source of the rumor. OHC's reports were provided to Walker. The defendant stresses Walker's testimony that she advised the hiring manager that the plaintiff did not pass his pre-placement physical examination, but without sharing anything about his having failed a drug test. (Doc. 37-2 at 8). Walker, however, also testified that at least two other employees of the defendant were aware of the content of the reports, (Doc. 37-6 at 20, 37),[21] and the defendant has presented no evidence to negate their having disclosed the plaintiff's use of medication.[22] Thus, even if the evidence negates Walker as a source of the disclosure,[23] it does not exclude other employees of the defendant as the source. On motion for summary judgment, the defendant bears the initial burden of pointing to evidence that either negates

---

[20] To the uncertain extent the defendant asserts that the plaintiff's testimony is hearsay, he is not offering it to prove that he actually was on four or five medications but to show that the statement was made.

The defendant stresses that Dickson denies that Zielinski told *him* anything about the plaintiff's medication, (Doc. 41-18 at 26; Doc. 44 at 13 n.27), but that does not negate the plaintiff's evidence of what Zielinski told the plaintiff's boss.

[21] There may be others, because Walker testified that, from the reports, "we understood" that OHC had determined the plaintiff could not perform safety-sensitive job duties. (Doc. 37-2 at 6). The defendant's brief accentuates this possibility, as it insists that Walker "was entitled to disclose the results of the pre-employment physical examination to those decisionmakers involved in the hiring process." (Doc. 36 at 27 n.9).

[22] One of these individuals was situated in the administration building, (Doc. 37-6 at 20), where a rumor circulated that the plaintiff was not hired due to having too much medication going on.

[23] It is unclear whether Walker's testimony that she did not tell anyone "why [she] rescinded the offer for Mr. Byrd," (Doc. 37-6 at 37), negates her having told anyone about his use of prescription medications, as she could have reported his use of medications without saying that was why she rescinded the job offer.

disclosure by the defendant or shows that the plaintiff can produce no such evidence.  The defendant's presentation does neither.

The defendant stresses that there is evidence the plaintiff himself was the source of the rumors.  (Doc. 36 at 27).  The defendant notes that Dickson testified the plaintiff told him he was not hired "because he was prescribed some medication."  (Doc. 41-18 at 26).[24]  The plaintiff in his declaration agrees he did so but says that Dickson was the first person he told about the results of his pre-employment evaluation and that any subsequent references to those results were in response to the rumors going around.  (Doc. 41-22 at 1-2).[25]  Moreover, Dickson testified that he told no one what the plaintiff had told him.  (Doc. 41-18 at 27-28).

In its reply brief, the defendant adds testimony from Dickson that the plaintiff "told everybody that worked with us" that he didn't get hired "because of the prescriptions he was on," although Dickson could offer only one instance. (Doc. 44 at 13 n.29; Doc. 41-18 at 27-28).  As noted, the plaintiff testified that he spoke to no one (except Dickson) about why his offer was rescinded until after rumors were swirling that he was a druggie, and Dickson's testimony is consistent with that chronology.[26]

In a motion to strike, the defendant argues that the plaintiff has only "speculation and conjecture" to support the proposition that Walker, Zielinski, or any other manager employed by the defendant disclosed, or failed to keep

---

[24] The defendant also relies on the plaintiff's testimony that he probably told one or more employees of the defendant that his job offer was withdrawn, (Doc. 36 at 12, 27; Doc. 37-1 at 81), but such a statement does not disclose confidential medical information.

[25] The defendant argues that this testimony should be stricken as inconsistent with the plaintiff's deposition.  (Doc. 45 at 4, 6).  As addressed in the preceding note, the plaintiff in his deposition testified only that, at some undetermined time (not, prior to the rumors) he probably told one or more persons that his job offer was withdrawn (not, that he took medications).  The plaintiff's declaration patently is not inconsistent with this vague deposition testimony.

[26] Dickson's testimony suggests that the plaintiff was correcting a false impression that he used illegal drugs by explaining that the drugs were prescribed.

confidential, his medical information.  (Doc. 45 at 5).  The defendant has not explained, and the Court does not perceive, how the plaintiff's evidence could be so described.  There is evidence of all the following:  (1) that the medical information was made public; (2) that, prior to it being made public, the plaintiff shared the information with only one person (Dickson); (3) that Dickson did not share the information with anyone; (4) that at least three employees of the defendant were aware of this information from the time of its receipt from OHC; and (5) that a supervisory employee of the defendant was spreading the information.  Finally, there is an absence of evidence negating disclosure of the information, or a failure to keep it confidential, by the three employees of the defendant who knew of it initially.  Without cogent argument, which the defendant does not provide, the Court cannot characterize the plaintiff's evidence as merely speculative.

The defendant does not dispute that the plaintiff has evidence he experienced emotional distress as a result of the alleged unlawful disclosure of his medical information.  The defendant argues, however, that "mere emotional distress" is insufficient to support such a claim, absent a "tangible injury," such as a loss of employment caused by the disclosure.  (Doc. 36 at 27-28; Doc. 44 at 14).  The defendant relies on *Armstrong v. Turner Industries, Inc*., 141 F.3d 554 (5th Cir. 1998); *Cossette v. Minnesota Power & Light*, 188 F.3d 964 (8th Cir. 1999); and *Giaccio v. City of New York*, 502 F. Supp. 2d 380 (S.D.N.Y. 2007).  The plaintiff counters with *Harrison v. Benchmark Electronics, Inc*., 593 F.3d 1206 (11th Cir. 2010).

None of the defendant's cases hold that emotional distress alone does not support a cause of action under Section 12112(d).  The Fifth Circuit required a "cognizable injury in fact" before damages may be awarded for an improper medical inquiry in violation of Section 12112(d)(2), but it did not address whether emotional distress would suffice.  141 F.3d at 562.  The Eighth Circuit ruled that a claim of wrongful disclosure under Section 12112(d)(3) requires "some sort of

tangible injury," which it equated with *Armstrong*'s "cognizable injury in fact," 188 F.3d at 970, but it did not say that emotional distress does not suffice; on the contrary, the Court remanded the case for consideration of whether "being treated in a condescending and patronizing manner" constitutes tangible injury. *Id*. at 971-72. The *Giaccio* Court ruled only that allegations of emotional distress, "*unsupported by any evidence*, are insufficient to establish the damages necessary" to avoid summary judgment on a claim under Section 12112(d)(3). *Id*. at 387 (emphasis added).

The Eleventh Circuit in *Harrison* "agree[d]" with *Armstrong* and *Cossette* (among other appellate decisions) that "a non-disabled plaintiff [must] at least show some damages (emotional, pecuniary, or otherwise) caused by a § 12112(d) violation." 593 F.3d at 1216-17. The Eleventh Circuit expressly translated the "injury-in-fact" language of these decisions as "damages." *Id*. & n.12. By using the disjunctive "or," the Eleventh Circuit signaled that emotional damages, standing alone, will support recovery.

In summary: (1) the "tangible injury" requirement on which the defendant relies is an "injury-in-fact" requirement; (2) "injury-in-fact" in the Eleventh Circuit means "damages"; (3) damages to support recovery under Section 12112(d) include emotional damages; and (4) emotional distress damages from a violation, standing alone, will support recovery under such a claim.

The defendant suggests that *Harrison* is inapposite because, in that case, the plaintiff was damaged by not being hired as a permanent employee. The facts to which the *Harrison* rule was applied, however, are irrelevant; what matters is that *Harrison* establishes a rule under which emotional distress damages suffice to support a claim.[27]

---

[27] *Harrison* was decided under Section 12112(d)(2) rather than Section 12112(d)(3). The defendant does not seek to distinguish *Harrison* on this ground, and it could scarcely do so, given that *Harrison* relied on *Tice v. Central Area Transportation Authority*, 247 F.3d 506 (3rd Cir. 2001). In *Tice*, a Section 12112(d)(3) case, the Third Circuit similarly "all[ied] ourselves with these holdings" that a plaintiff under Section

In its reply brief, the defendant for the first time argues that this claim must fail because the plaintiff is not a qualified person with a disability.  (Doc. 44 at 12).  The argument comes too late but, in any event, and as addressed in Part I.A.2, the defendant has failed to show that the plaintiff is not a qualified individual with a disability.

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment is **denied**.  The defendant's motion to strike, to the extent it has been discussed in this opinion, is **denied**, and is otherwise **denied as moot** because the Court has not relied on the evidence to which it is directed.

DONE and ORDERED this 13th day of June, 2022.

s/WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

12112(d) must demonstrate "actual damage (emotional, pecuniary, or otherwise)."  *Id*. at 519.  The *Tice* Court rejected the plaintiff's reliance on emotional distress, not because such damages are legally insufficient to support a claim, but because the plaintiff, while alleging emotional distress in his complaint, offered no evidence of such damages in opposition to the defendant's motion for summary judgment.  *Id*. at 520.